UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MOISES I. FUENTES, JR., and ANA P. FUENTES, by and through their Guardian ad Litem, BLANCA MARTINEZ**<br><br>            Plaintiffs,<br><br>     v.<br><br>**COUNTY OF MADERA, A Municipal Corporation and Public Entity, CORRECTIONAL MANAGED CARE MEDICAL CORPORATION, and DOES 1 through 50, inclusive,**<br><br>            Defendants. | 1:04-CV-05919 OWW SMS<br><br>MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT CORRECTIONAL MANAGED CARE MEDICAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT |

## 1.   INTRODUCTION

Defendants Correctional Managed Care Medical Corporation ("CMC") move for summary judgment on Plaintiffs' wrongful death claim. (Doc. 50, Motion for Summary Judgment, Filed May 30, 2006.) Plaintiffs Moises I. Fuentes, Jr., and Ana Fuentes through her guardian, Blanca Martinez have not opposed the motion. This order is based entirely on arguments set forth in CMC's moving papers.

## 2.   PROCEDURAL BACKGROUND

Plaintiffs filed their original complaint on June 30, 2004, invoking federal jurisdiction under the Civil Rights Act 42 U.S.C. § 1983. (Doc. 1, Complaint.) Plaintiffs filed a second amended complaint on November 9, 2005. (Doc. 32, Second Amended

1

Complaint "SAC".)  On February 2, 2005, Defendant County of Madera ("the County") filed a first amended cross-claim against CMC for indemnification of the claims Plaintiffs asserted against them.  (Doc. 8, Cross-Claim For Indemnity.)  Defendants filed their answer to Plaintiffs' SAC on December 9, 2005.  (Doc. 35, Answer to Amended Complaint by CMC.)  On May 24, 2006 Plaintiffs' attorney moved to withdraw as attorney on the grounds that her clients have failed to respond to her attempts at communication regarding their case.  (Doc. 45, Motion to Withdraw as Attorney of Record for Plaintiffs.)  On June 30, 2006 Magistrate Judge Sandra M. Snyder granted the motion to withdraw.  (Doc. 67, Order granting Motion to Withdraw as Attorney.)

CMC filed a motion for summary judgment on May 30, 2006. (Doc. 50, Defendants Motion for Summary Judgment.)  To date, Plaintiffs' have not filed opposition to the motion.

### 3. **FACTUAL BACKGROUND**[1]

**A.   Background of Medical Treatment**

Moises Fuentes ("Mr. Fuentes") arrived at Madera County Jail on July 22, 2003 after having been transferred there from Folsom Prison. (DSUF, No. 1.)  At the time of his transfer, Mr. Fuentes was 29 years old.  (*Id.*)  No transfer information regarding any previous weight loss, complaints of a sore throat were provided to CMC. (*Id.*)  The chart notes reflect he complained of a sore throat and requested a medical evaluation on July 28, 2003. (DSUF, No. 2.)

---

[1] All facts are undisputed and based entirely on CMC's moving papers.

**2**

He was seen and evaluated by CMC R.N. personnel on July 30, 2003. (*Id.*)  At that time, he complained of a sore throat for approximately one month, but denied fever, chest pain, shortness of breath, or coughing of any blood. (*Id.*)  His weight was 155 lbs. (*Id.*)  His examination on July 30, 2003 was normal. (DSUF, No. 3.)  However, his tonsils were enlarged and showed evidence of exudate. (*Id.*)  He was diagnosed with pharyngitis and treated accordingly with 10 days of antibiotics, acetaminophen for discomfort, and advised to rinse with warm saline and to follow up if there was no improvement. (*Id.*)  Orders were countersigned by Dr. Walters. (*Id.*)  On August 19, 2003, Mr. Fuentes requested another medical visit, complaining that while he had completed his antibiotics, his throat was still sore and he was having difficulty swallowing food. (DSUF, No. 4.)  Mr. Fuentes was seen that same day by nursing staff (FNP) who examined Mr. Fuentes and found his left tympanic membrane ruptured, his nose runny and inflamed, and his throat still inflamed. (DSUF, No. 5.)  He was prescribed Kenalog and antihistamines for what were presumed to be ongoing allergies. (*Id.*)  Orders were countersigned by Dr. Walters. (*Id.*)  There was no reason at this point to suspect a more severe problem. (*Id.*)

On August 22 and 29, 2003, Mr. Fuentes complained that he still was not feeling better, and requested that a physician see him. (DSUF, No. 6.) On September 3, 2003, Mr. Fuentes was seen and evaluated by Dr. Walters. (DSUF, No. 7.)  At this time, it appeared his tonsils had resolved (were no longer swollen), but his throat was still inflamed and it appeared he had a post nasal drip. (*Id.*)  Dr. Walters suspected an ongoing allergic rhinitis,

**3**

or possibly an unresolved bacterial infection, and prescribed a second allergy medication (CTM). (*Id.*)

On September 7, 2003, Mr. Fuentes reported that he was having some rectal bleeding. (DSUF, No. 8.) He was seen and evaluated on September 8 and 9, 2003, by CMC nursing staff. (DSUF, No. 9.) At this point, Mr. Fuentes reported his swallowing was better after starting the second antihistamine. (*Id.*) However, his stool was black, tested positive for blood. (*Id.*) As a result, it was suspected that he had Gastritis. (*Id.*) At this point, he weighed 148 lbs. (*Id.*) A full liquid diet was ordered and Mr. Fuentes was placed in the medical department. (*Id.*) Previcid (a proton pump inhibitor used for gastric acidity and/or reflux) was added to help with his presumed gastritis. (*Id.*) Orders were countersigned by Dr. Walters. He was checked on September 10 and 11, 2003, by CMC nursing and then returned to the general population on September 12, 2003. (*Id.*)

He was then seen by Dr. Walters on September 16, 2003, complaining that his pain with swallowing was increasing. Dr. Walters ordered a barium swallow in one week if his symptoms did not improve. (DSUF, No. 10.) He was seen by CMC nursing personnel (R.N.) on September 19, 2003, with ongoing complaints. (DSUF, No. 11.) However, he was refusing the prescribed liquid diet. (*Id.*) A barium swallow was scheduled for September 25, 2003 at Madera Community Hospital. (*Id.*) On September 25, 2003, he was transported to Madera Community Hospital, and the barium swallow was performed. (DSUF, No. 12.) It revealed an area of narrowing (stricture), which explained the difficulty in

**4**

swallowing.  (*Id.*)

On September 26, 2003, he was scheduled for esophagoscopy and esophageal biopsy with an outside specialist to take place at Madera Community Hospital on October 8, 2003.  (*Id.*)  He was seen on October 4 and October 6, 2003.  (DSUF, No. 13.)  He was referred to the Madera Community Hospital emergency room on October 6, 2003, for evaluation after a rectal examination was positive for blood, and was sent back with a diagnosis of rectal bleeding and constipation.  (*Id.*)

On October 8, 2003, he was transported to Madera Community Hospital, and had an esophageal biopsy, which was interpreted by the pathologist as demonstrating an adenocarcinoma in the distal third of the esophagus.  (DSUF, No. 14.)  The pathology report was received at the Madera Jail on October 13, 2003.  (*Id.*)  On October 14, 2003, an appointment with a gasteroenterology specialist, Dr. Akhtar, was scheduled for October 15, 2003, and an appointment with an oncologist, Dr. Padmanabhan, was scheduled for October 20, 2003.  (*Id.*)

On October 14, 2003, he was seen by Dr. Walters and informed of the diagnosis of adenocarcinoma of the esophagus.  (DSUF, No. 15.)  After complaints of bloody vomitus were received, he was seen by CMC nursing staff (FNP), and was moved to the medical department for monitoring.  (*Id.*)  His vital signs were monitored and determined to be stable.  (*Id.*)  He was scheduled to be reevaluated again by Dr. Walters the next morning.  (*Id.*)  On October 15, 2003, Mr. Fuentes was seen by CMC nursing personnel and Dr. Walters with complaints of right flank pain and midepigastric pain. (DSUF, No. 16.)  Orders were received by Dr.

Walters for a CBC, metabolic panel, CA 19-9, and for Vicoden and Vistril (50mg) to be administered. (*Id.*)  He was also seen by gastroenterology specialist, Dr. Akhtar, x-rays were taken of the chest, and an additional referral was requested for a consult with an oncology specialist.  (*Id.*)

The CMC staff was able to schedule an appointment sooner than the October 20, 2003 appointment previously made with Dr. Padmanabhan, with oncologist, Dr. Shaikh, for October 16, 2003. (*Id.*)  He was seen by oncology specialist, Dr. Shaikh, on October 16, 2003 who ordered CT scans of the chest, abdomen, and pelvis in addition to whole body bone scans.  (DSUF, No. 17.) Mr.Fuentes' CEA and LDH levels were checked and Dr. Shaikh arranged for placement of a PEG tube for nutrition and for medi-port placement by interventional radiology for chemotherapy delivery. (*Id.*)  A Two-D echocardiogram was then requested for assessment of baseline, wall motion and ejection fraction prior to chemotherapy. (*Id.*)

Dr. Shaikh's plan was to treat Mr. Fuentes with combined modality therapy with chemotherapy, radiation, and surgery. (DSUF, No. 18.)  It is also likely that a complete metastatic evaluation was done as well. (*Id.*)  For pain control, he was given a prescription of Duragesic 25 mcg patch. (*Id.*)  Mr. Fuentes was then returned to the clinic for follow-up. (*Id.*)

On October 18, 2003, he began receiving Boost nutritional supplement administered through the PEG tube.  (DSUF, No. 19.) He continued to receive Vicodin, Duragesic patches, and Boost every 4 hours thereafter. By the following day, he was feeding himself through the tube demonstrating excellent technique and

understanding of the tube. (*Id.*)

On October 20, 2003, he was transferred from Madera County Jail custody with the remaining Duragesic patches, Boost, and feeding syringes, and was not seen again by CMC personnel. (*Id.*) Although defendant does not have further information at this time as to the nature of his subsequent medical course as it relates to his esophageal cancer, CMC contends that the care and treatment that the CMC staff provided to Mr. Fuentes while he was housed at the Madera County Jail was reasonable, appropriate, and within the standard of care. (DSUF, No. 20.) CMC further claims that although Mr. Fuentes often refused his medications, the infirmary staff was not deterred from going to great lengths to ensure that he was given the best care possible under the circumstances, including promptly scheduling necessary consults and studies, which typically is a time consuming process. (*Id.*) Thus, CMC argues that the care given by the staff at CMC was conscientious and with the best interests of the health and welfare of Mr. Fuentes in mind. (*Id.*) Specifically, a two month period of evaluation for Mr. Fuentes' symptoms in the manner in which they presented is well within what is seen commonly in the community, especially considering how unlikely a diagnosis of esophageal cancer is in a 29 year old. (DSUF, No. 21.) In fact the time lapse is quite rapid. (*Id.*) CMC claims that it is not unusual that scheduling the studies and consults take 2 to 4 weeks to schedule and complete when there does not appear to be a medical urgency. (*Id.*) CMC further claims that it is understandable that the diagnosis of cancer was not what the health care workers were considering as the likely diagnosis when

they scheduled these tests and consultations.  (*Id.*)

As for the result, and assuming Mr. Fuentes passed away from adenocarcinoma of his esophagus, CMC claims that the time period from July 28, 2003 to October 8, 2003, is unlikely to have decreased his chance of survival or cure.  (DSUF, No. 22.)

CMC claims that they do not know what happened after Mr. Fuentes left Madera Jail nor does it know the exact extent of his esophageal cancer (length, thickness, metastatic evaluation), but the months between initial presentation of symptoms and histological diagnosis of his malignancy appears to have had no effect on his recommended treatment or his likelihood of cure insofar as different treatment would have been recommended had he been considered unresectable.  (*Id.*)  Therefore, CMC claims that there is no evidence of indifference or breach of duty by CMC which led to Mr. Fuentes' injuries.  (DSUF, No. 23.)

### B.  Plaintiffs' Causes of Action

In their SAC, Plaintiffs' bring a 42 U.S.C. section 1983 cause of action against the County.  (Doc. 1, Complaint, Paras. 23-28.)  They also bring a state law claim for wrongful death against CMC.  (Doc. 1, Complaint, Paras. 29-30.)

### C.  County of Madera's First Amended Cross-Claim for Indemnity

In their first amended cross-complaint, the County argues that any damages alleged by Plaintiffs arose out of CMC's performance under an existing agreement between CMC and The County to provide health care services for all inmates in the custody of the Madera County Department of Corrections.  (Doc. 8, First Amended Cross-Claim, Paras. 3-6) The County thus asserts a

**8**

claim for indemnification against CMC for any judgment entered against them, for any attorneys fees and costs incurred, and for any other such relief.  (Doc. 8, First Amended Cross-Claim, Page 3, Paras. 1-3)

### 4.  STANDARD OF REVIEW

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material.  *Id*.  A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.  *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  Facts are "material" if they "might affect the outcome of the suit under the governing law."  *Campbell*, 138 F.3d at 782 (quoting *Anderson*, 477 U.S. at 248).

The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party

>                who fails to make a showing sufficient to
>                establish the existence of an element essential
>                to the party's case, and on which that party
>                will bear the burden of proof at trial.  In such
>                a situation, there can be "no genuine issue as
>                to any material fact," since a complete failure
>                of proof concerning an essential element of the
>                nonmoving party's case necessarily renders all
>                other facts immaterial.

*Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986).  The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment.  *See United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the evidence must be viewed in a light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to determine whether there is a genuine issue for trial.  *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir. 1996).

### 5.   **DISCUSSION**

#### A.   **Subject Matter Jurisdiction**

Federal courts are courts of limited jurisdiction and may only preside over certain types of civil cases, as authorized by Congress and the United States Constitution.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  A court has "federal question jurisdiction" over civil actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  Alternatively, federal district courts possess "diversity jurisdiction" over civil suits where the parties are citizens of different states and the dispute involves more than

1  $75,000.00.  28 U.S.C. § 1332.

**B.   Supplemental Jurisdiction**

Title 28 U.S.C. section 1367(a) provides in pertinent part:

> "In any civil action of which the district courts have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

Plaintiffs' state law claims invoke supplemental jurisdiction as they arise from the same controversy as their 42 U.S.C. section 1983 claim.

In California, a person making a claim against a public entity or a public employee must present such a claim in writing to the clerk, auditor or secretary of the local public entity within six months after the accrual of the cause of action.  Cal. Gov. Code § 911.2.; see also *Javor v. Taggart*, 98 Cal. App. 4th 795, 804 (Cal. Ct. App. 2002) (submission of a claim to a public entity pursuant to the California Tort Claims Act is a condition precedent to a civil action against the state or its employees and failure to present the claim bars the action.)  A person may not maintain a cause of action against a public entity or public employee without having first presented a claim as required by California Statute.  Cal. Gov. Code 945.4.  Cal. Gov. Code section 954.6 requires that a claimant file a civil action within six months after the public agency issues its decision.  *Javor*, 98 Cal. App. 4th at 804.  Plaintiffs filed a claim against the

County pursuant to Cal. Gov. Code § 911.2.

**C.    Plaintiffs' Standing**

Cal. Civ. Code section 377.60 sets forth three categories of persons who may bring a wrongful death action:

> 1.  The decedent's surviving spouse, domestic partner, children, and issue of deceased children or, if there is no surviving issue of the decedent, the persons, including the surviving spouse entitled to decedent's property by intestate succession
>
> 2.  Whether qualified under the first category or not, a putative spouse, stepchildren, and parents, if they were dependent on the decedent; and
>
> 3.  Whether or not qualified under the first or second category, a minor who, at the time of the decedent's death, resided for the previous 180 days in the decedent's household and depended on the decedent for one half or more of this or her support.

Plaintiffs, as Mr. Fuentes' children have standing to bring a wrongful death claim under California law through a court appointed guardian.

**D.    Wrongful Death**

A cause of action for wrongful death is a statutory claim in California. Cal. Code Civ. Proc. sections 377.60-377.62; *Quiroz v. Seventh Ave. Center*, 140 Cal. App. 4th 1256, 1263 (Cal. Ct. App. 2006). Its purpose is to compensate heirs for the loss of companionship and for other losses suffered as a result of a decedent's death. *Id.* The elements of the cause of action for wrongful death by a health care provider are the (1) elements of a tort for professional negligence, (2) the resulting death, and (3) the damages, consisting of the pecuniary loss suffered by

**12**

the heirs. *Id.* The elements of professional negligence are (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional negligence. *Elcome v. Chin*, 110 Cal. App. 4th 310, 317 (Cal. Ct. App. 2003).

### i. CMC's Duty To Provide Mr. Fuentes with Medical Care

A health care provider has a duty to use a reasonable degree of skill, knowledge, and care in treating a patient, commensurate with that possessed and exercised by others practicing within that specialty in the professional community. *Calderon v. Glick*, 131 Cal. App. 4th 224, 234 (Cal. Ct. App. 2005).

Defendants' do not dispute that they owed a duty to Mr. Fuentes to provide him with medical care.

### ii. Plaintiffs' Fail to Provide Any Evidence to Show That CMC Breached Their Duty of Care to Mr. Fuentes

The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents a basic legal issue and can only be proven by expert testimony, unless the conduct required by the particular circumstances is within the common knowledge of a layperson. *Elcome*, 110 Cal. App. at 317. Where the conduct required of a medical professional is not within the common knowledge of laypersons, a plaintiff must present expert witness testimony to prove a breach of the standard of care. *Bushling v.*

**13**

*Fremont Medical Center*, 117 Cal. App. 4th 493, 509 (Cal. Ct. App. 2004).

The undisputed facts show that when Mr. Fuentes was transferred to CMC, CMC was not provided with information regarding any previous weight loss or complaints of a sore throat. (DSUF, No. 1.) Upon his transfer, Mr. Fuentes was 29 years old. (*Id.*) After he was examined on July 30, 2003, Mr. Fuentes was determined to have symptoms of a throat infection, a common condition. (DSUF, No. 3.) Mr. Fuentes was again seen the following month on August 19, 2003 after he continued to complain of a sore throat and difficulty swallowing his food. (DSUF, No. 4.) He was seen that same day by nursing staff who diagnosed his problem to be the result of ongoing allergies and was prescribed antibiotics accordingly. (DSUF, No. 5.) The undisputed facts show that there was no reason at this point to suspect a more severe problem. (*Id.*)

After continuing to complain that he was not feeling well, Mr. Fuentes was again treated on September 3, 2003 by Dr. Walters who determined that his throat was still inflamed and suspected an ongoing allergic rhinitis or unresolved bacterial infection. (DSUF, No. 7.) Subsequent to this check up, Mr. Fuentes was diagnosed with Gastritis after his stool tested positive for blood. (DSUF, No. 9.) After several more complaints that he was having trouble swallowing, Mr. Fuentes was transported to Madera Community Hospital where a barium swallow was performed. (DSUF, No. 12.) On October 8, 2003 an esophageal biopsy was performed and a pathologist at Madera Community Hospital determined that Mr. Fuentes had adenocarcinoma. (DSUF, No. 14.) CMC received

**14**

the pathology report on October 13, 2003 and Dr. Walters informed Mr. Fuentes on October 14, 2003.  (DSUF, No. 15.)  Mr. Fuentes was subsequently moved to the medical department where his vital signs were monitored.  (*Id.*)  During this time he was provided with the following treatment:

> 1. Mr. Fuentes was given a CBC, metabolic panel, CA 19-19, and given Vicoden and Vistril (50 mg)
> 2. Mr. Fuentes was seen by a gastroenterology specialist
> 3. X-rays of his chest were taken.

(DSUF, No. 16.)  On October 16, 2003 he was treated by an oncology specialist who ordered CT scans of his chest, abdomen, and pelvis, in addition to whole body bone scans.  (DSUF, No. 17.)  At this time his CEA and LDH levels were checked and the treating doctor, Dr. Shaikh, arranged for placement of a PEG tube for nutrition and for medi-port placement by interventional radiology for chemotherapy delivery.  (*Id.*)  Dr. Shaikh's plan was to treat Mr. Fuentes with combined modality therapy with chemotherapy, radiation, and surgery.  (DSUF, No. 18.)  On October 20, 2003 he was transferred from Madera County Jail custody with Duragesic patches for his pain, Boost, and feeding syringes.  (DSUF, No. 19.)  He was not seen again by CMC personnel.  (*Id.*)  CMC has no further information as to the nature of his subsequent medical course as it relates to his esophageal cancer.  (DSUF, No. 20.)

   Plaintiffs' have not filed any response to CMC's motion for summary judgment.  Plaintiffs have not provided any evidence or

**15**

expert testimony to show that CMC's conduct fell below the standard of care required from a health care provider in such circumstances.

### iii. Plaintiffs Fail to Show that CMC's Actions Were the Actual or Proximate Cause of Mr. Fuentes' Death

Cal. Civ. Code section 1714.8 provides:

> No health care provider shall be liable for professional negligence or malpractice for any occurrence or result solely on the basis that the occurrence or result was caused by the natural course of a disease or condition, or was the natural or expected result of reasonable treatment rendered for the disease or condition.  This section shall not be construed so as to limit liability for the failure to inform of the risks of treatment or failure to accept treatment, or for negligent diagnosis or treatment or the negligent failure to diagnose or treat.

Professional negligence is defined as a negligent act or omission by a health care provider in rendering professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital.  Cal. Civ. Code section 3333.2(c)(2).  Plaintiffs must prove that CMC's negligence was a cause in fact of Mr. Fuentes' injury.  *Jennings v. Palomar*

**16**

*Pomerado Health Systems, Inc.*, 114 Cal App. 4th 1108, 1118 (Cal Ct. App. 2003).

In any personal injury action causation must be proven within a reasonable medical probability based on competent expert testimony. (*Id.*) Mere possibility alone is insufficient to establish a prima facie case. (*Id.*) There can be many possible "causes," indeed, an infinite number of circumstances that can produce an injury or disease. (*Id.*) A possible cause only becomes probable when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. (*Id.*) To establish causation the Plaintiff must offer expert opinion that contains a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it is more probable than not the negligent act was a cause in fact of the plaintiff's injury.

In failing to respond to CMC's motion, Plaintiffs have not shown that any action on the part of CMC was a substantial factor in causing Mr. Fuentes' injuries or death. Plaintiffs' offer no facts to show failure to diagnose or treat Mr. Fuentes. Plaintiffs also fail to show that CMC's actions were more likely than not the cause of Mr. Fuentes' death.

CMC's motion for summary judgment as to Plaintiffs' wrongful death claim is GRANTED.

### E. The County Has Failed to Show That They Are Entitled to Indemnity from CMC

A party seeking indemnity, without a judgment ordering it to pay, has the burden of demonstrating that it is actually or at

**17**

least potentially liable on the underlying claim and that the settlement amount is reasonable. *Cossu v. Jefferson Pilot Sec. Corp. (In re Cossu)*, 410 F.3d 591, 595 (9th Cir. 2005).

The County has not responded to CMC's motion for summary judgment as to their first amended cross-claim for indemnification. In a related motion, the County has sought dismissal of Plaintiffs' 42 U.S.C. section 1983 claim against them and that dismissal has been granted. The County is unable to show that CMC is at least potentially liable on the underlying claim or that the County is entitled to indemnification from CMC.

CMC's motion for summary judgment as to the County's first amended cross-claim for indemnification is GRANTED.

### 6. CONCLUSION

For the reasons set forth above Defendant CMC's motion for summary judgment as to Plaintiffs' wrongful death claim is **GRANTED**.

CMC's motion for summary judgment as to County of Madera's first amended cross-claim for indemnification is **GRANTED**.

IT IS SO ORDERED.

**Dated:   October 30, 2006**              /s/ Oliver W. Wanger
dd0l0                                      UNITED STATES DISTRICT JUDGE